CONSOLIDATED SOLUBLES COMPANY, a corporation of the State of Delaware, and DAVID LEVIN, an individual,

*vs.*

CONSOLIDATED FISHERIES COMPANY, a corporation of the State of Delaware, THOMAS H. HAYES, an individual, and RICHARD C. HAYES, an individual.

*Sussex, August 27, 1954.*

*Samuel R. Russell,* of the firm of Tunnell & Tunnell, George-town, and *William Ginsberg,* Philadelphia, Pa., for plaintiffs.

*John Van Brunt, Jr.,* of the firm of Killoran & Van Brunt, Wilmington, for defendants.

BRAMHALL, Vice Chancellor: Plaintiff David Levin (Levin) and defendant Thomas H. Hayes (Hayes) in 1951 entered into negotiations relative to the erection of a plant on the property of defendant

Consolidated Fisheries Company (Fisheries) for the manufacture of a by-product of the plant of Fisheries known as condensed fish stickwater. Fisheries is engaged in the processing of oils and fertilizer from fish. The condensed stickwater is a by-product recovered by a process of evaporation from the waste coming from the Fisheries plant. On April 6, 1951 Fisheries and Levin entered into a written contract in which it was provided that Levin was to invest certain monies up to the maximum amount of $50,000 for the purpose of incorporating a company in Delaware to be known as the Consolidated Solubles Company (Solubles), or some other appropriate name, for the purpose of erecting a plant on the ground leased by Fisheries and for the equipment thereof in order to manufacture what is called fish solubles. At the same time another agreement was entered into between Levin and Fisheries providing that Fisheries would have an option to purchase Levin's complete interest in the new plant.

The agreement between Fisheries and Levin provided that Fisheries was to cooperate in the erection of the plant and was to operate the same after completion. Fisheries was to act as sales agent in the sale of the product of Solubles for which it was to receive a commission. The product was to be sold by Fisheries in the name of Solubles and the proceeds derived from the sale were to be deposited by it to Solubles' account. Profits were to be divided after depreciation and expense of operation, Fisheries to receive 60% and Solubles 40% of the net profits.

Shortly after the beginning of the construction of the plant and the purchase of certain machinery it became apparent that the plant could not be constructed for $50,000. Levin was so informed by Hayes. On May 31, 1951 a new agreement was drawn under which Levin agreed to advance a maximum of $70,000 instead of the sum of $50,000 as originally contemplated. It was provided in both agreements that it was to be in force for a period of ten years from December 31, 1951, and that Fisheries was to have the option of purchasing all of the stock of Solubles. Fisheries agreed to supply the weak stickwater, oil, supplies, labor and was to supervise the operation of the plant itself.

Plaintiff advanced and expended a sum somewhat in excess of $70,000 for the erection of the plant and the installation of the equipment. However, the plant, according to Fisheries, actually cost the sum of approximately $95,000. According to plaintiff the cost of the plant was somewhat in excess of $49,000. Fisheries demanded payment of the difference between $70,000 and $95,000 and upon the failure of Solubles to pay the same proceeded to sell the product of Solubles in the name of Fisheries and to retain all of the receipts therefor with the exception of a small item of $71.19. Plaintiffs contend that the plant was operated by Fisheries without consulting Solubles or Levin; that the statement submitted by Fisheries to Solubles, both as to the cost of erection of the plant and cost of production of the product, were grossly excessive and were based upon incorrect records; that the action of Fisheries in selling the product in the name of Fisheries and retaining the proceeds was contrary to the agreement and was a fraud upon Solubles.

On July 7, 1953, at the request of Solubles, I ordered that a preliminary injunction should issue directing Fisheries to desist from selling the product of Solubles as its own and not under the name of Solubles and from failing to apply the proceeds of such sales to the account of Solubles. No relief was provided for as to any sales or receipts by Fisheries prior thereto. An appeal was taken from this order. A motion to dismiss was filed and on September 18, 1953 the Supreme Court directed that the appeal be dismissed. 99 *A.2d* 497.

Solubles is asking for an accounting for the monies advanced by it in the construction of the plant and for the monies collected by Fisheries in the sale of the product of the plant. Solubles also asks that Fisheries be enjoined permanently from selling the product of the plant as the product of Fisheries or in any other manner than that of the product of Solubles. Solubles also requests that Fisheries be compelled to remit to Solubles the proceeds of the sale of the product of the plant in accordance with the agreement between the parties. Fisheries has given an accounting of the cost of the construction of the plant and of the cost of its operation and the proceeds of the sale of the product. However, Solubles contends that this accounting is grossly incomplete, incorrect and fraudulent. Solubles further con-

tends that in any event it is not responsible for the payment of any sum in excess of $70,000.00, which it contends is the maximum amount which it can be called upon to pay in the construction of the plant. In addition, numerous exceptions have been taken to the account filed by Fisheries. In the determination of the rights of the parties it will be necessary to consider the specific exceptions raised by Solubles.

The first question which I should determine is the limit of the responsibility of Solubles in the erection of the plant. The agreement of April 6, 1951, relative to the erection of the plant, provides that Levin shall make available to Solubles for that purpose "capital and loans not exceeding $50,000.00." The agreement of May 31, 1951 provides:

"1. There is contemplated that Consolidated Solubles, Inc., will expend the maximum of Seventy Thousand Dollars ($70,000) for the construction of a 'stickwater' plant to be located on the premises of Consolidated. Levin shall advance to Consolidated Solubles, Inc., as much additional funds to enable Consolidated to expend up to Seventy Thousand Dollars ($70,000) for the erection of said plant."

The purpose of these contracts is to provide for an advancement by Levin to Solubles for a sum of money to be used in the erection of the stickwater plant. As I interpret these contracts, the sum of $50,000, and later the sum of $70,000, was the outside limit which Solubles agreed to advance for the erection of the plant. Assuming, however, that the understanding between the parties as set forth in these agreements is not entirely clear, the testimony as to the negotiations between Hayes and Levin indicate clearly that the limit for which Solubles was to be responsible was $70,000. Levin is an accountant. He had had no experience and knew nothing about the business in which Fisheries was engaged. All he learned about the manufacture of condensed stickwater was originally obtained from Hayes. Certainly any prudent business man under such circumstances would want a definite limit to be placed upon his responsibility when he was going into a venture about which he knew practically nothing.

I find from the testimony of Levin and his wife, which is not seriously disputed, that it was only after Hayes had promised that he would look after the construction of the plant, that he had steel and many other materials and equipment which he would supply at cost and that the cost of the building could not exceed the amount specified in the agreement as the maximum sum to be advanced by Solubles, that Levin agreed to enter into the project. The furnishing of all material and equipment, labor and supervision was by Fisheries. It was Fisheries' responsibility therefore to see that the plant was erected in a proper manner and at a sum not in excess of the amount specified. Since Solubles' responsibility is limited to the sum of $70,000, all sums spent over and above that amount for the erection and equipment of the plant, are the responsibility of Fisheries and not that of Solubles.

Fisheries says that the size of the building was changed and that the purchase of certain equipment was the reason why the cost of the erection of the plant exceeded $70,000 and that by reason thereof Solubles agreed to permit Fisheries to sell the product of the plant in its own name and for its own account. In substantiation of this reference is made to a letter to this effect which was for a short period of time and which was never signed by Solubles. Attention is also called to the testimony of Levin to the effect that at one time he did give authority to Hayes to sell the product of Solubles in the name of Fisheries and to retain the proceeds thereof. As to the letter it is significant that it was never signed. As to the question and answer put to Levin in this respect, such testimony is contrary to his other testimony and it in any event cannot be accepted as proof of the fact that Hayes was given complete authority for an unlimited period of time to sell the product of Solubles in the name of Fisheries and apply the proceeds therefrom to Fisheries' account. It is also significant that the matters of which Fisheries complains and which Fisheries says was the cause for the alleged oral agreement between Fisheries and Levin occurred prior to the execution of the second agreement. If there was an agreement between the parties, why was not their understanding inserted in the written agreement? It is difficult to understand, if there was such an agreement, how two experienced business men would have failed to insert it in a written agreement which was drawn shortly thereafter.

I conclude that the advancement by Fisheries of all sums in excess of $70,000 for the erection of the plant and equipment therefor was a voluntary act on the part of Fisheries for which Solubles should not be held responsible.

Is Solubles entitled to any refund from the sum of $70,000 advanced by it for the construction of the plant? The records of Fisheries show that the plant cost approximately $95,000. Admittedly, many of those records are inaccurate and possibly are duplications. In view of that fact both parties had appraisals by experts. There is a considerable variation between the appraisals of Solubles and the appraisals of Fisheries. However, the principle cause of the difference in the amount of these appraisals is the difference in construction which the parties have placed upon the word "plant". Plaintiffs' appraisals largely were limited to the building itself and certain equipment immediately adjacent thereto. Without going into detail it is sufficient to say that it did not include certain tanks and lines leading to the plant which were necessary in order for the plant to function. Defendants' inventories on the other hand, not only included the building and the equipment therein, but all material and supplies which were necessary or incidental to the construction and operation of the plant.

The word "plant" must be interpreted in accordance with the agreement between the parties. Here the parties entered into an agreement relative to the construction and operation of a plant the purpose of which was to manufacture concentrated stickwater from the by-product of the Fisheries plant. It is therefore clear that the parties in referring to the "plant" referred to a unit in conjunction with the building and equipment of Fisheries already erected. An establishment was to be created for the purpose of manufacturing a substance from the by-product of Fisheries. When the word "plant" was used in that connection, it referred not only to the building itself but to the machinery, equipment, pipes, tanks and whatever else was necessary for the proper construction of the plant and tying it in with Fisheries since it could not function without the use of Fisheries' by-products. Considering the purpose of its erection, I conclude that it was intended to include everything necessary for its operation. See

*Old Colony Trust Co. v. Standard Beet Sugar Co., (C.C.)* 150 F. 677; *Otis Elevator Co. v. Arey-Hauser Co., (D.C.)* 22 *F.Supp.* 4; *Nelson v. Downtain, (Tex.Civ.App.)* 1922, 249 *S.W.* 241; *In re American Pile Fabrics Co., (D.C.)* 12 *F.Supp.* 86. When the parties entered into their agreement it was necessary in order that they might carry out the purpose for which the plant was being constructed that there be a tie-in with the establishment of Fisheries. When it is considered that the use of the word "plant" is the only reference made to describe what the parties intended to do and since in order for them to carry out their intentions it was necessary that pipes and tanks, pumps and other material and equipment be installed, I conclude that the word "plant" includes this and all other items necessary for the furtherance of that purpose.

In view of the interpretation which I have placed upon the use in the agreement of the word "plant", I am of the opinion that the evidence shows that Fisheries expended for its construction the sum of $70,000 or more.

I therefore conclude that plaintiff is not entitled to a refund on the $70,000 advanced by it.

Depreciation.

In the accounting submitted by Fisheries the rate of depreciation was computed on the basis of 5% on the buildings and 10% on the equipment. Solubles has excepted, claiming that depreciation should have been 10% on both building and equipment.

The ground upon which the establishment of Solubles is erected is held by Fisheries under a long-term lease. The right of Solubles to erect a plant for the manufacture of condensed stickwater is as a result of the contract between Solubles and Fisheries. This contract is for a ten-year term, after which it is the privilege of Solubles to remove the building and equipment and machinery installed therein. The record is silent as to what would be the cost of the removal of the machinery and equipment at the end of the ten-year period and what amount Solubles might derive therefrom. Undoubtedly, this is due to the fact that no one could determine at this time either the

cost of removal or the value of the articles after they have been moved. The difficulties of removal, the condition of the machinery and equipment at the time of the removal and the demand, if any, for such machinery and equipment on the market, is highly uncertain. It is fair to say that it is at least doubtful as to whether or not Solubles would realize anything after the cost of removal and sale would have been paid.

■ It is established procedure to depreciate both real and personal property during the term of a lease. Without determining Solubles' position in this respect under the term of the agreement, I am of the opinion that this relationship is similar in this respect to that of landlord and tenant and that the depreciation should be made in accordance with established practice during the term of the agreement.

### Charges for Use and Rental of Equipment.

Fisheries has charged Solubles for the use or rental of certain equipment, to which exception has been taken by plaintiff. Plaintiffs' objections are: (1) no charge was to be made for the use of the equipment as such; (2) in the event that this court should determine that a charge was proper it should be based upon cost to Fisheries only; and, (3) such charges should in any event be reasonable.

■ I am not willing to accept Solubles' contention that all of the equipment which Fisheries placed at Solubles' disposal should not be paid for. There is some evidence of a statement made by Hayes which plaintiff contends was an inducing cause to the execution of the contract. However, as I understand such testimony, its force was to the effect that the equipment and anything else should be furnished at cost. I accepted Solubles' contention that Fisheries should bill it only for its actual cost in furnishing the same to Solubles and if Fisheries could have furnished an accurate statement of its costs in that respect Solubles would have had to pay the same. However, Fisheries kept no records of the use of this equipment but charged Solubles for the equipment whenever it found from its records that certain men who used this equipment when it was used were working

on Solubles' job. Fisheries had a number of other jobs going on at the same time Solubles' plant was being constructed. Many of the men who worked on Solubles' plant, at times, also worked on jobs of Fisheries. It is too remote to say that Solubles should pay for the use of equipment because certain men who used that equipment when it was used worked at certain particular times without any evidence at all to show that during any of those times the equipment was being used by them.

## Charges for Furnishing Water.

Fisheries furnished Solubles with both sea water and fresh water for the operation of its plant. The sea water was used for cooling and washing and the fresh water was used in the boiler. No charge was made for the sea water other than for the pumping. Fisheries has charged Solubles the sum of $2,830.25 for the cost of connecting the sea water line with Solubles' plant. Fisheries has also charged Solubles for the use of said line (in addition to the charge for electric power from July, 1951 up to and including October, 1952) the sum of $1,208.33. Since I have held that all connections to Solubles' plant which were necessary to be made to carry out the purpose of its erection were properly a charge for the construction of the plant itself and were a part of the plant, the said sum of $2,308.25 must be considered a part of the cost of the construction of the plant. However, this charge was merely for an extension of the line which had already been constructed by Fisheries for its own use. Fisheries would therefore be entitled to a rental on its own line and since the amount claimed by Fisheries is not being attacked as unreasonable, this item will be allowed.

## Charge for Fresh Water.

It is asserted on behalf of Fisheries that its charges for fresh water were estimated charges. For the months of June and July the amount of water consumed by Solubles was fixed by comparing the water consumption of Fisheries for the months of June and July, 1950 with the actual consumption of Fisheries plus the consumption of Solubles during the same months for the year 1951 with an adjust-

ment for the fact that the fish catch in 1951 was larger than it was in 1950 and with the 1950 consumption being adjusted by a strict arithmetical percentage increase in fish catch applied to the previous year's water consumption to determine the normal amount of water consumption for the entire Fisheries plant for the months of June and July, 1951. After determining the normal consumption of Fisheries the total consumption was determined and the Fisheries' consumption was deducted therefrom, leaving a balance of water consumed which was charged to Solubles. It is obvious from a mere statement of Fisheries methods that the results obtained by these methods could at best be nothing more than an estimate. That this is so is illustrated by the fact that for the months of August, September and October exactly 675,000 gallons of water are charged to Solubles. Moreover, for the month of June Solubles is charged for 1,509,891 gallons of water as against 154,909 gallons charged to Fisheries when at the time the Fisheries plant was in operation and the Solubles plant was not. According to the witness Cunningham, who was in charge of the erection of the Solubles' plant, the water line to the Solubles' plant was not even at that time connected. The operations of Fisheries and Solubles are each seasonable operations. Since Solubles uses the by-product of Fisheries, generally speaking, when the Fisheries' plant was in operation the Solubles' plant was also in operation. When Solubles is using substantial quantities of water it would seem that Fisheries would also be using substantial amounts.

I cannot accept Fisheries' explanation that the use of such large quantities of water was due to waste. Fisheries was in charge of the operation. If there was waste of water, it was Fisheries' responsibility and Solubles should not be charged therefor. Expert evidence was offered, based upon the figures submitted as to the operation of Solubles' plant. While this evidence is also quite uncertain, I find that in the present case it is considerably more accurate than that of the so-called estimates made by Fisheries. Without discussing the testimony of a number of witnesses who were called, I find myself in agreement with the testimony of Dr. Berglin and Prof. Colburn, of the University of Delaware, the latter being the Provost and Professor of Chemical Engineering at that institution. Based

upon the evidence submitted their testimony was to the effect that the maximum amount of fresh water used by Solubles for the period of from June to October 15, 1951 was approximately 700,000 gallons as against the figure estimated by Fisheries of approximately 4,260,000 gallons. They were entirely disinterested witnesses. Their competence is unquestioned. I therefore accept their figure as to the amount of fresh water consumed by Solubles.

█ Solubles also objects to the per gallon charge made by Fisheries for the water furnished. The witness Cunningham, who testified as an expert witness, and who was in charge of the construction of the plant, testified that the price of .0002116 cents per gallon was a fair and reasonable charge. Although Fisheries has objected strenuously to the testimony of Cunningham in other respects, this testimony is not contradicted. I have found that Fisheries agreed to furnish material, supplies and equipment at cost. Considering the fact that Fisheries is making a separate charge for power, I accept this figure as reasonable.

### Electricity.

The objection of Solubles to the charge for electricity is threefold: (1) Solubles contends that it should not be compelled to pay for electricity for the operation of a 100-h.p. pump at the dock when a 15 or 20-h.p. pump would answer the purpose; (2) Solubles contends that the amount of electricity consumed by it, including the pump at the dock, was 132,677 kilowatt hours and not 186,435. Omitting the amount consumed by the pump at the dock, Solubles contends that the amount consumed by it was 55,220 kilowatt hours; and, (3) Fisheries charge Solubles at the rate of 4.49¢ per kilowatt hour, whereas Solubles contends that the agreed price and the cost price was 1.5¢ per kilowatt hour.

█ I cannot accept Solubles' contention as to the pump at the dock. The pump was already installed at the time Solubles connected with the line. Solubles was faced with the alternative of building a completely new line or paying an excessive cost for electricity, since Fisheries also used this line. In connecting with the old line Solubles chose to pay the cost of excessive amount for electricity.

Neither can I accept Solubles' contention as to the amount of electricity consumed. The testimony of the experts was in conflict. However, the testimony of several witnesses called by Fisheries was based upon the fact that several tests were made as to the amount of electricity consumed by Solubles, by shutting off all the power in every plant but the Solubles' plant. Of course, this is also an estimate but the testimony offered by the witnesses for Fisheries in this respect has a greater basis of fact.

Fisheries' charge of 4.49¢ per kilowatt-hour is excessive. I have already held that the cost of all materials, labor and supplies furnished by Fisheries was to have been at cost. The evidence shows that not only was the cost to Fisheries 1.5¢ per kilowatt-hour but that Hayes on behalf of Fisheries agreed to accept that amount. True, he contends now that this was in compromise and was not accepted by Solubles. An examination of his testimony, however, does not show that Levin specifically rejected the offer, assuming it was a compromise. Solubles' figure of 1.5¢ per kilowatt-hour will be accepted.

### Charge for Fuel Oil.

Fisheries billed Solubles for fuel oil for the 1951 season in the amount of 99,000 gallons. It is not stated in Fisheries' brief, and I am unable to find from the voluminous testimony in this case, the basis upon which this charge is made. I assume therefore that it is estimated in a manner somewhat similar to the manner in which the charge for electricity and water was made.

Testimony was offered by the witness Cunningham, who had charge of the erection of the plant, that while it was possible to use the amount of fuel for which plaintiff was charged, if that were the case, the product produced by the Solubles' plant would have been considerably greater. The witness Bergelin, who is apparently an impartial witness, testified that while it might have been possible to use this amount of oil under his calculations 83,000 gallons of oil would have been all that was necessary to use. These estimates were estimates of experts after an examination of the plant. In my opinion their testimony is the most reliable testimony offered with relation to

the amount of fuel oil used by Solubles. I therefore accept Bergelin's estimate of 83,000 gallons as the amount of fuel oil for which Solubles should be charged.

## Product.

Solubles contends that a much greater amount of solubles was produced during the season of 1951 than shown by the statements submitted by Fisheries. This contention is based upon the testimony of the witness Cunningham, Fisheries' charge for water, power, and fuel oil and Fisheries' estimate for the 1951 season.

[14] I cannot accept Solubles' contention in this respect. There is no direct evidence to prove this contention. The witness Cunningham was not present during the operation. There is also evidence to the effect that the plant was closed for a very substantial amount of time for repairs and cleaning. Solubles' proof in this respect is too remote and therefore cannot be accepted.

## Tanks.

Solubles contends that an item of $8,425 originally agreed upon for the purchase and installation of seven tanks should be deducted from the cost price of $70,000 since the order for these tanks was later cancelled. The cost price of $70,000 was the overall price for the erection of the plant. I have held that "plant" included other facilities necessary in order to carry out the purpose of its erection. The testimony of both Levin and Hayes indicates clearly that both parties considered the tanks as an essential part of the plant. They even agreed upon a price for the sale of the tanks, although later Levin decided not to purchase them. Since the tanks were a part of the plant and since the overall figure for the construction of the plant was $70,000, this item should be deducted from the overall cost of $70,000. Since the tanks were later rented by Fisheries to Solubles and since there was no undestanding relative to the cost of reconditioning the tanks, defendant cannot receive credit for this item. It should however receive credit for the cost of adapting the same to Solubles' particular use. Fisheries should be allowed the rental charges for the tanks as agreed upon.

### Hidden Tank.

 Solubles contends that Fisheries had a so-called "hidden tank" in which a portion of the product of the Solubles' plant was stored without the knowledge of Solubles and for the purpose of defrauding it. Without going into detail, the evidence submitted is too remote. While there is some evidence relating to the construction of a pipe line, there is no evidence to show its actual connection with the line or that any of the product was actually stored therein.

### Cost of Operational Production.

 Solubles contends that in estimating the cost of operational production Fisheries failed to take into account monies expended directly by Solubles. The expenditures of Solubles amounted to $19,406.82 and included items for supplies, travel, miscellaneous, insurance, professional services, and other expenses which were obviously litigation expenses. Of course, any items expended directly by Solubles which were a part of the cost of the actual operation of the plant, will be included along with the expenditures of Fisheries. However, the expenditures of Solubles or Fisheries in this law suit or in preparation therefor are not a part of the operational expenses contemplated at the time of the execution of the contract between the parties. The expenditures of the parties for the latter purpose will not be allowed.

### Plaintiffs' Prayers.

Plaintiffs have asked this court to direct the defendants to give a true and accurate accounting both in the erection of the plant and in the operation thereof. Defendant has in a large measure given an accounting of its receipts and expenditures, to which many exceptions have been taken by plaintiffs. Most of these exceptions have been discussed in this opinion and in a number of instances plaintiffs' objections have been sustained. The instances which have not been disposed of in this opinion have been considered and plaintiffs' contentions have not been allowed because they have either not been established by the facts or because of the fact that the amounts in-

volved are so small as not to warrant the expense of a further accounting in order to obtain further definite information, if such is possible, for the purpose of arriving at a decision with reference thereto. As to the matters covered by this opinion defendants should file an amended account as advised herein.

Plaintiffs also ask for injunctive relief. They request that the present temporary injunction be made permanent. Under the temporary injunction defendants are restrained from selling the product of Solubles other than in the name of Solubles and from depositing the proceeds received through the sale of the product of Solubles in any account other than that in the name of Solubles. Fisheries has objected to the prayer for injunctive relief on the grounds: (1) the agreement is one for a joint venture, which is not specifically enforceable; (2) the agreement is too vague and indefinite to be enforced by a court of equity; (3) to grant injunctive relief would require continued supervision or policing by the court for an indefinite period of time; (4) plaintiffs have breached the contract by failing to make any payment for the operational expenses billed to them; and, (5) plaintiffs have an adequate remedy at law.

I do not consider it necessary to discuss the objections of defendants to the prayer for injunctive relief ad seriatim. As stated by the supreme court in its opinion in this case relative to the granting of a preliminary injunction by this court, plaintiffs' request is not for specific performance but is for injunctive relief with reference to a single paragraph of the contract. The order for the preliminary injunction and the prayer of plaintiffs for the permanent injunction do not contemplate ordering defendants to operate the plant: they merely direct defendants, should they proceed to operate and to sell the product of the plant, that they must not violate the terms of this particular paragraph of the agreement in doing so. No request is made,—and no such request would be granted,—to compel defendants to proceed with the operation of the plant as provided by the contract. But that does not mean that merely because a specific performance decree may not be granted in a certain case that injunctive relief may not be granted to enforce an express promise in a negative form. *New York Johnson Motor Co., Inc. v. Johnson Motor Co.,*

15 *Del.Ch.* 356, 138 *A.* 603; See 5 *Corbin on Contracts, Sec.* 1205, *p.* 854; 4 *Pomeroy's Equity Jurisprudence,* (*5th Ed.*) *Sec.* 1344, *p.* 945.

In view of the nature of the relief asked for the objections as to the transaction being a joint venture, and the necessity for continued supervision of the court for a considerable period of time are of no merit. The objection of defendants that plaintiffs have breached the contract by failing to make a single payment for operational expenses was considered and denied by the supreme court in the opinion relative to the preliminary injunction when it said:

> "Solubles' inability to pay resulted from Fisheries' refusal to comply with the contract. Again, Fisheries seeks to turn its own default to its own benefit. The argument is without merit."

The jurisdiction of this court in this case has not been disputed. Plaintiffs have asked for an accounting. The nature of the accounting is such that equity would have jurisdiction. In the determination of this suit, this court has the power to grant such other and incidental relief as may be necessary to afford to plaintiffs a complete relief. The contract is still in full force and effect. Its validity is not disputed. The parties have proceeded for a period of more than two years to operate under its terms and conditions. The relief prayed for by plaintiffs is necessary for their protection since the paragraph in question, which provides for the sale of the product in the name of Solubles and the deposit of the monies in the account of Solubles, is the only paragraph of the contract which gives to Solubles any protection. A permanent injunction will be granted enjoining defendants from selling the product of Solubles other than in the name of Solubles and from depositing the receipts from the sale of the product in any account other than that in the name of Solubles.

Order on notice in accordance with this opinion.